George A. Butler and Anne G. Butler v. Commissioner. John M. Sheesley and Jean Sheesley v. Commissioner. Otto B. Schoenfeld and Hazel Schoenfeld v. Commissioner.
Butler v. Commissioner
Docket Nos. 58729-58731.
United States Tax Court
T.C. Memo 1958-150; 1958 Tax Ct. Memo LEXIS 79; 17 T.C.M. (CCH) 752; T.C.M. (RIA) 58150; July 31, 1958
*79 The principal petitioners were three of several stockholders of a corporation which was organized in 1946 to erect and operate a chemical plant. Construction of the plant continued for about 2 years, and approximately $1,250,000 was spent thereon. The bulk of this capital was obtained through the issuance of stock, and the issuance of certain long-term subordinated notes which were acquired by the stockholders, including the petitioners. Upon completion of the plant in about February 1949, it failed to function properly, due to mechanical and technical difficulties which were encountered. The management then proceeded to rectify these difficulties; obtained the assistance of an experienced engineer to advise them on the practicability of using the plant to manufacture an additional product; and installed a pilot plant for experimentation on the production of such additional product. This experimentation was still in progress at the end of the year 1949, and continued into the early months of 1950. There was no identifiable event in 1949 which wiped out the corporation's potentiality for earning profits. The corporation actually went into production in 1950, and continued to operate *80 until sometime in 1953. Held, that neither the common stock nor the subordinated notes of the corporation became wholly worthless during and within the year 1949; and that petitioners are not entitled to deductions based on the claimed worthlessness of such securities in said year. William C. W. Haynes, Esq., Philip A. Masquelette, Esq., 3100 Gulf Building, Houston, Tex., and Carl B. Fox, Jr., Esq., for the petitioners. Robert L. Liken, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: These cases, which were consolidated for trial, involve deficiencies in income tax as follows: Deficiencies
Docket Nos.
Petitioners
1949
1950
1951
58729
George A. and Anne G. Butler
$34,665.64
$12,227.64
58730
John M. and Jean Sheesley
19,710.36
1,669.86
$7,639.22
58731
Otto B. and Hazel Schoenfeld
16,214.60
3,772.11
The issues for decision are whether (1) the common stock of Gulf Chemical Company, a Texas corporation, and (2) this corporation's 4 per cent subordinated notes due April 30, 1953, both became worthless in the year 1949 - so that losses with respect of such securities held *81 by the petitioners are deductible by them in 1949, under sections 23(g)(2) and 23(k)(4) of the 1939 Code. Decision on the above issues will be determinative of whether capital loss carryover deductions for subsequent years are allowable to petitioners, as claimed by them. Findings of Fact Certain facts have been stipulated. The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by reference. The petitioners in each case are husband and wife, residing in Houston, Texas. Each of the couples filed joint income tax returns for the years involved, with the collector of internal revenue for the first district of Texas. In 1945, petitioners John M. Sheesley and Otto B. Schoenfeld were partners in the business of manufacturing and selling pumps, including a device for proportioning soluble phosphates into drinking water for cattle. Following the close of World War II, the users of these latter devices found it difficult to obtain sodium phosphates; and therefore these petitioners explored the possibilities of producing this type of chemical in a plant of their own. After consulting chemical engineers, including a man named Truman Wayne, they *82 concluded that construction of a plant solely to meet the needs of the users of their proportioning device would not be practicable; but that a plant could be erected at an estimated cost of approximately $250,000, exclusive of the plant site and docks, which could meet the growing demand for sodium phosphates, both in the cattle feed and other industries. Realizing that they alone would be unable to finance a venture of this size, they approached petitioner George A. Butler; interested him in coming into the venture; and arranged with him to furnish a substantial portion of the anticipated capital requirements. The first step in getting the venture started was the organization of a Texas corporation in August 1946, known as Gulf Chemical Company. The original capital stock of this company was $12,500 divided into shares of the par value of $1 each. All of the shares were subscribed and fully paid at the time of incorporation. The record does not disclose whether any persons, other than the three above-mentioned organizers, became stockholders; nor does it show what consideration was delivered to the corporation for the stock. There is evidence that, at about this time, the corporation *83 acquired a 19.8-acre tract of land located on the Houston Ship Channel at Galena Park, Texas, for its plant site. On January 5, 1947, Butler was elected president of Gulf Chemical Company; and, at about that time, construction was started on a plant to produce principally sodium phosphates, and phosphoric acid. The estimated period for completion was approximately 1 1/2 years. Wayne was retained to design the plant and supervise the construction. As the construction progressed, it was found that substantially more capital than had originally been anticipated, would be required. Accordingly, the following steps to obtain additional capital were taken during the years 1947 and 1948: "1. On March 15, 1947, Gulf's board of directors authorized the borrowing of $80,000 from the National Bank of Commerce of Houston, on a 4 per cent promissory demand note secured by a deed of trust covering the company's real estate. On July 16, 1947, $30,000 of said amount was so borrowed. "2. On August 5, 1947, the corporation's charter was amended, so as to increase the authorized capital stock from 12,500 shares to 55,500 shares of the par value of $1 per share. All the additional 43,000 shares *84 were subscribed and paid for. The record again does not disclose the identity of the shareholders who acquired this stock; nor does it disclose what consideration was delivered to the corporation for such additional shares. "3. On September 30, 1947, the corporation's board of directors authorized the issuance of $250,000 principal amount of 4 per cent subordinated promissory notes due April 30, 1953. By the end of the year 1947, $180,650 principal amount of such notes were outstanding in the hands of 20 stockholders; and none of such notes were held by others than stockholders. "4. On December 6, 1947, Gulf and the National Bank of Commerce of Houston executed a loan agreement, under which the bank agreed to make advances to the corporation up to April 1, 1948, for plant construction, in the aggregate amount of $325,000, including the $30,000 previously loaned. This loan agreement was thereafter successively amended and extended by supplemental agreements to December 1, 1948. Up to September 15, 1948, the corporation borrowed from the bank, in addition to the initial $30,000, a total of $245,000 as follows: "April 17, 1948
$75,000
May 12, 1948
75,000
July 3, 1948
50,000
August 5, 1948
30,000
September 15, 1948
15,000
*85 "5. On March 2, 1948, the corporation's board of directors authorized the raising of further capital in the amount of $160,000, for plant construction, through: "(a) Issuance of 4,000 additional shares of common capital stock, to be sold by the corporation at $3.43 per share; and "(b) Issuance of an additional $146,000 principal amount of 4 per cent subordinated promissory notes due April 30, 1953. "In order to carry out this plan, the corporation's charter was amended on March 3, 1948, to increase the authorized capital stock from 55,500 shares to 61,000 shares, of the par value of $1 per share. As regards the promissory notes, the directors recalled the outstanding notes in the principal amount of $180,650; issued, in exchange therefor, new notes of the same principal amount to the prior noteholders; and proceeded to issue additional notes up to the newly increased amount of $350,000. "6. On December 11, 1948, the board of directors authorized the raising of still further capital for plant construction, by increasing the principal amount of its 4 per cent subordinated promissory notes due April 30, 1953, from $350,000 to $675,000. As of the end of the year 1948, $521,974.41 *86 principal of such promissory notes were outstanding in the hands of 29 stockholders." The plant was completed in about February 1949; and up to that time approximately $1,000,000 over the original estimate had been expended. The plant's production process, as designed by Wayne, differed from the one commonly used throughout the United States in producing sodium phosphates, in that it involved the use of a large kiln to defluorinate the phosphate rock. When attempts were made to put the plant into operation, various difficulties with the equipment were encountered; and the plant failed to produce sodium phosphates of the quality or quantity desired. Principal among these difficulties was that, when a mixture of crushed phosphate rock and phosphoric acid was fed into the long 150-foot kiln, it tended to cake up near the inlet, and to create such weight that the motor burned out and the conveyor was unable to remove the material from the kiln. Other major difficulties were that a submerged burner in one of the reaction tanks cracked; that the resin lining in the reaction tanks failed to provide sufficient insulation from the acid; and that the monel metal filters which had been purchased *87 secondhand from the War Assets Administration, developed leaks. Repairs and attempts to remedy the defects were then undertaken. During the year 1949, the following additional financing was done by the corporation: "1. Approximately $115,000 was raised through the issuance of additional 4 per cent subordinated promissory notes, previously authorized. All of these notes were acquired by stockholders. "2. On March 19, 1949, all amounts previously borrowed from the National Bank of Commerce of Houston were consolidated into one note in the principal amount of $275,000, payable in quarterly installments of $14,475 each beginning June 1, 1949, with interest at the rate of 4 per cent per annum payable quarterly. Said note was secured by a deed of trust covering the 19.8-acre plant site and all improvements thereon. The maturity of this note was thereafter successively extended to August 1, 1949, and to September 1, 1949. "3. On May 16, 1949, the corporation's board of directors authorized the raising of further capital for plant construction and operating funds, through issuance of $200,000 principal amount of 4 1/2 per cent preferred second lien promissory notes due April 30, 1953. *88 These notes were secured by a subordinated deed of trust and chattel mortgage. "As of the close of the year 1949, $148,294.68 principal amount of these second lien notes were outstanding in the hands of 8 stockholders who also were holders of the corporation's 4 per cent subordinated promissory notes. Of said amount, the principal petitioners loaned the following amounts on such notes, on the following dates during the year 1949: "George A. Butler
May 12
$10,000.00
May 13
5,000.00
June 17
40,000.00
August 26
500.00
Sept. 2
2,000.00
Sept. 2
1,500.00
Sept. 16
1,000.00
Sept. 30
1,700.00
Oct. 17
1,805.71
Dec. 20
103.30
Total
$63,609.01
"Otto B. Schoenfeld
(individually)
June 9
$1,000.00
"John M. Sheesley
(individually)
May 20
$ 810.67
Sept. 19
500.00
Nov. 1
400.00
Nov. 17
200.00
Total
$1,910.67
"Sheesley and Schoenfeld
May 26
$ 4,000
June 2
45,000
Sept. 19
500
Nov. 1
400
Nov. 17
200
Total
$50,100
"The balance of said $148,294.68 was loaned by: W. J. Goldston on May 20 and August 5 in the amount of $11,445; George Bruce on June 27 in the amount of $3,935; J. O. Winston on July 5 in the amount of $1,650; *89 W. L. Goldston on July 29 and August 5 in the amount of $11,445; and Clayton Smith between August 26 and December 20 in the amount of $3,200. "4. On about December 5, 1949, Gulf issued 250 additional shares of its common stock to 10 new stockholders." By August 1949, Gulf had not succeeded in solving its major production problems; and the plant had not reached the operative stage. Attempts at full scale operation were then suspended, although the chief chemist and other supervising officials continued to work. At about this same time, consideration was given to either selling the plant in its entirety, or to arranging a consolidation with other chemical manufacturers, or to obtaining financial help from them. Representatives of three such manufacturers visited the plant, but no offers were received. Sometime in August 1949, petitioner Schoenfeld who was then vice-president and acting general manager concluded that, before further attempts were made to put the plant in full scale operation with consequent loss of materials, experimentation should be undertaken with a view to eliminating the difficulties which had been encountered. Accordingly, he built a small kiln which would *90 operate with less material, conducted experiments therewith, and made test runs of the plant based on such experiments. In this manner, he found a way to overcome the difficulties which had been encountered with the larger kiln. However, the prosphoric acid produced in such test runs, which was necessary for the production of sodium phosphates, was still not of the desired purity; so Schoenfeld then sought the advice of engineers employed by other operators in the field. Among such engineers was a man named Yates who was in charge of research, development, and production of phosphates, for the Tennessee Valley Authority. In September 1949, a meeting was held which was attended by Wayne, Butler, Schoenfeld, and two other principal investors in Gulf Chemical Company. At this meeting, Schoenfeld's experimental work was discussed, and a decision was made to have Yates come to the plant and assist in the solution of Gulf's problems. Prior to Yates' arrival at the Gulf plant in about October 1949, Schoenfeld concluded that, since considerable money would be required to produce salable sodium phosphates, a search should be made for additional products that could be manufactured at the *91 plant, such as calcium phosphates. Yates and Wayne, after examining the plant, agreed that calcium phosphates, as an additional product, could be produced in the plant. Schoenfeld then made a market survey in respect to such chemical; found that there was a great demand for the same; and concluded that Gulf Chemical Company could realize a reasonable profit from the manufacture of calcium phosphates. In about November or December of 1949, Schoenfeld, assisted by chemical and engineering employees of the corporation, built a pilot plant equipped with a 13-foot motor driven gas-fired kiln; and they proceeded to run experiments on the production of calcium phosphates. These experiments continued into the year 1950. Schoenfeld found from such experiments that Gulf's plant had the basic equipment necessary to produce calcium phosphates, if a suitable drying mechanism were added. About $6,000 was expended in connection with such experimental work and the above-mentioned market survey. On December 5, 1949, petitioner George A. Butler resigned as president of Gulf Chemical Company, and petitioner Otto B. Schoenfeld became president of the corporation. As of December 31, 1949, Gulf's *92 plant still had not reached the operational or production stage. It was normal, however, for a new chemical plant of such character to have difficulty getting into production, particularly where its process embodied the novel feature of using a large kiln, and where consideration was being given to modifying the plant for manufacture of an additional product. By said date however, a solution to the difficulties encountered with the kiln had been found; and experiments directed toward the manufacture of calcium phosphates, as an additional product, had been begun and were still actively under way. As regards the corporation's financial condition on December 31, 1949, three $14,475 installments which had become due in June, September and December on the note held by the National Bank of Commerce of Houston, were unpaid; and interest on the last two of these installments also was unpaid. The 1948 and 1949 annual interest installments on the 4 per cent subordinated promissory notes held by stockholders, were likewise unpaid. And also, the November 15, 1949, semi-annual interest installment on the 4 1/2 per cent preferred second lien promissory notes held by certain of the stockholders, *93 was unpaid. However, none of the holders of the above-mentioned notes had commenced any proceeding to enforce collection; nor had they taken any step to accelerate payment of principal in accordance with the terms of the notes; nor had they attempted to foreclose on the collateral with which certain of the notes were secured. As of December 31, 1949, there had been no declaration of insolvency of Gulf Chemical Company; no petition in bankruptcy, either voluntary or involuntary, had been filed; and no action had been taken by the corporation's officers, board of directors, or stockholders, toward dissolving the company, placing it in liquidation, dismantling its plant, or discontinuing its business operations. Except for one temporary shutting off of electric power in November, because of an overdue electric bill, no action had been brought by any creditor to collect any debt of the corporation. A summary of the balance sheet of Gulf Chemical Company, as of December 31, 1949, is as follows: ASSETS
Current Assets
Inventories
$ 3,800.00
Prepaid expenses
21,127.80
Total current assets
$ 24,927.80
Fixed Assets
Marchinery and equipment
$ 767,518.22
Buildings
237,939.54
Miscellaneous
113,246.06
Total
$1,118,703.82
Less: Allowance for depreciation
308.19
Net depreciable assets
$1,118,395.63
Land
61,706.59
Net fixed assets
$1,180,102.22
Other assets
1,721.19
Total Assets
$1,206,751.21
LIABILITIES AND CAPITAL
Current Liabilities
Mortgage note payable to National Bank of
Commerce
$275,000.00
Insurance premium note payable to Na-
tional Bank of Commerce
11,209.05
Accrued interest on notes
48,154.28
Vouchers payable
40,095.61
Bank overdraft
14.17
Accrued liabilities
6,830.74
Total current liabilities
$ 381,303.85
Long-term liabilities
4 1/2% preferred second lien notes due 4/30/53
$148,294.68
4% subordinated promissory notes due
4/30/53
636,932.49
Total long-term liabilities
785,227.17
Total Liabilities
$1,166,531.02
Capital
Common stock
$ 61,000.00
Surplus
Capital surplus
117,865.01
Earned surplus (deficit)
(138,644.82)
Total capital and surplus
40,220.19
Total Liabilities and Capital
$1,206,751.21
*94 On March 9, 1950, president Schoenfeld submitted a report to the Gulf Chemical Company to the effect that his pilot plant experiments with respect to the production of calcium phosphates had been successful, and that his above-mentioned survey disclosed a favorable market for such chemical. Thereafter, on April 26, 1950, an informal meeting of the larger stockholders was held to discuss this report; and at this meeting, a decision was made that the manufacture and sale of calicum phosphates, as an additional product, should be undertaken by Gulf Chemical Company, (a) if $100,000 new capital could be raised, and (b) if a satisfactory arrangement could be made with the holders of the corporation's outstanding notes to forebear foreclosure thereon pending an attempt to put the corporation on a better financial basis. On May 9, 1950, which was about 2 weeks after said meeting, a plan for refinancing Gulf Chemical Company was formulated and submitted by the secretary of the company to the security holders. Among the principal proposals embodied in such plan were: That the existing authorized amount of the company's 4 1/2 per cent preferred second lien notes be increased from $200,000 *95 to $250,000, so that $100,000 additional capital could be raised from such source; that the holders of the outstanding 4 per cent subordinated notes be requested to waive their claims to the accrued and unpaid interest thereon; and that the holders of these notes be requested also to exchange such notes for a new issue of preferred stock to be authorized by the corporation. The purpose of such refinancing plan was, not only to improve the financial condition of Gulf Chemical Company, but also to permit the carrying out of a program for manufacturing calcium phosphates as a permanent part of the company's activities, in addition to its original program for production of sodium phosphates. President Schoenfeld, on June 10, 1950, wrote a letter to the National Bank of Commerce of Houston, in which he said: "The officers and principal security holders of Gulf Chemical Company, while they believe the new manufacturing program [manufacture of calcium phosphates] will be sufficiently profitable to make it a permanent part of the company's activities, have not abandoned their intention of producing sodium phosphates. Rather, the new program is viewed as a vehicle for putting the company *96 on a sufficiently sound financial basis that it may then devote further time and funds to utilization of the entire plant for the production of calcium phosphates and sodium phosphates." The principal stockholders and security holders who had adopted such refinancing plan at the informal meeting on April 26, 1950, deposited $100,000 with trustees for the benefit of Gulf Chemical Company, in anticipation that the plan would be approved by the other stockholders and security holders. And thereafter, during the year 1950, the following steps were taken: "1. On May 30, 1950, Gulf's board of directors increased the authorized amount of the corporation's 4 1/2 per cent second lien notes from $200,000 to $250,000. Thereupon, approximately $100,000 of new capital was raised by increasing the outstanding amount of such notes from $148,294.68 to approximately $248,000. Those stockholders and security holders who had previously deposited the $100,000 in trust for the company, converted such deposit into loans on said notes. Between May and December 1950, petitioner Butler thus loaned $43,796.42; W. J. Goldston loaned $43,492; W. L. Goldston loaned $2,500; J. O. Winston loaned $9,800; and *97 George Bruce loaned $2,216. Of this new capital, approximately $26,000 was used in adapting Gulf's plant to the production of calcium phosphates. "2. On June 10, 1950, Gulf made an agreement with the National Bank of Commerce of Houston, under which the maturity date of the past due installments of principal on the corporation's $275,000 note was extended to September 1, 1950. At about the same time, all past due interest on the note, in the amount of about $6,000, was paid. "3. On November 6, 1950, Gulf's stockholders at a special meeting, (a) approved the above-mentioned refinancing plan and (b) amended the charter of Gulf Chemical Company, so as to increase the amount of its capital stock to $697,950, represented by: The previously issued 61,000 shares of common stock of the par value of $1 per share; 12,075 shares of class A preferred stock of the par value of $25 per share, to be issued in exchange for 4 per cent subordinated promissory notes surrendered by holders who participated in raising said $100,000 of new capital; and 13,403 shares of class B preferred stock of the par value of $25 per share, to be issued in exchange for 4 per cent subordinated promissory notes surrendered *98 by holders who did not participate in raising the new capital. "4. By about the end of the year 1950, all of Gulf's outstanding 4 per cent subordinated promissory notes, except $6,000 principal amount thereof, were surrendered by the holders, in exchange for shares of the newly authorized preferred stock. Petitioners Butler, Sheesley and Schoenfeld were among those who participated in such exchange." During the first part of the year 1950, president Schonefeld learned that the process for making calcium phosphates, which he had developed in his pilot plant experiments, had recently been patented by International Mineral & Chemical Corporation. That firm, however, offered to license Gulf Chemical Company to use the process at a nominal royalty, and also to furnish technical supervision in putting Gulf's plant in operation. This offer was accepted; and thereupon, sometime in May or early June, a test run of the plant in the manner contemplated under the new manufacturing program, actually was made under the supervision and observation of a vice-president of International Mineral & Chemical Corporation. Thereafter, president Schoenfeld in his above-mentioned letter to the Houston *99 bank, dated June 10, 1950, expressed the belief that Gulf could have its new program in operation by August 1; that it could produce from 10,000 to 12,000 tons of calcium phosphates per year; and that on such tonnage, Gulf could make an estimated annual profit of $150,000. Gulf's plant went into production during the latter part of the year 1950, and continued during the years 1951, 1952, and 1953. Almost from the start, however, it faced not only continued difficulties with its equipment, but also new and unanticipated difficulties arising from market and economic conditions. Following the outbreak of the Korean War in June 1950, the selling price of its calcium phosphates was frozen at $65.50 per ton; while, at about the same time, its operating costs went up, due to increases in the prices of its raw materials, increases in freight rates, and increases in its payroll following the unionization of its employees. Also, Gulf was limited as to the purchase of one of its essential raw materials, with the result that its plant was able to operate at only 60 per cent of capacity, notwithstanding that the demand for its product was far greater than it could supply. The results of Gulf's *100 operations during the years 1950, 1951, and 1952 (exclusive of minor miscellaneous income, and exclusive also of a loss in 1951 from the sale of certain capital assets) were as follows: Profit (or
Loss After
Loss) Before
Depre-
Year
Sales
Depreciation
ciation
1950
$ 49,402.25
($69,000.59)
($171,840.11)
1951
591,175.76
57,361.47
(44,433.48)
1952
932,950.50
85,451.96
(21,961.42)
During said years, the principal amount of Gulf's note with the National Bank of Commerce was reduced, by periodic payments, from $275,000 to $160,000. As of April 30, 1953, Gulf's 4-1/2 per cent preferred second lien notes, in the principal amount of approximately $248,000, matured; and the corporation was unable to meet this obligation. Thereupon, the holders of these notes foreclosed; and, at the foreclosure sale held on December 1, 1953, petitioner Butler, acting on behalf of the noteholders, purchased all of the assets of the Gulf Chemical Company, and conveyed the same to a new Texas corporation organized for the purpose, known as Gulf Chemical Corporation, Inc. This purchase and conveyance was made subject to the rights of the National Bank of Commerce *101 of Houston. In 1955, the right of Gulf Chemical Company to do business in Texas was forfeited for nonpayment of franchise taxes. And in 1956, this company was notified by the Attorney General of Texas that an action was being commenced for forfeiture of its charter. Neither the shares of common capital stock of Gulf Chemical Company, nor the 4 per cent subordinated notes of said company, became worthless during and within the year 1949. Opinion The questions for decision, as before stated, are whether (a) the common stock of Gulf Chemical Company, a Texas corporation, and (b) that corporation's 4 per cent subordinated promissory notes due April 30, 1953, both became wholly worthless during and within the year 1949. The petitioners have contended that these questions should be answered in the affirmative; and accordingly they have claimed the benefit, not only of capital loss deductions for the year 1949 under sections 23(g)(2) and 23(k)(4) of the 1939 Code, [1] but also of capital loss carryover deductions for subsequent years. The respondent, on the other hand, has determined that said securities did not become worthless in the year 1949; and he has refused to allow the above-mentioned *102 deductions. The burden is, of course, upon the petitioners to establish the worthlessness. In the case of stock and of non-business debts, like those here involved, such worthlessness must be total worthlessness - and neither partial worthlessness nor mere shrinkage in value is sufficient. Whether stock or other securities of a corporation have become worthless in any particular taxable period is a question of fact, to be determined from a practical *103 consideration of all the evidence. ; see also, . Moreover, where the stock of a going corporation is claimed to be worthless, it must be established not only that the stock has no current liquidating value, but also that it has no potential value. In , affirmed (C.A. 7) , we said (at page 1278): "The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be *104 established ordinarily with satisfaction only by some 'identifiable event' in the corporation's life which puts an end to such hope and expectation." To the same effect, see , and authorities cited therein. In the instant case, we are convinced that the common stock of Gulf Chemical Company continued to have potential value throughout the year 1949; and also that, during said year, no identifiable event occurred to wipe out such potential value. In such situation we deem it unnecessary to consider such matters as liquidating value, and petitioners' contention that the corporation's balance sheet as of December 31, 1949, did not reflect its true financial condition. Gulf's plant had not been completed until about February 1949, after some 2 years of work thereon. Approximately $1,250,000 had been invested in the plant; and, at the end of the year involved, only $308.19 of depreciation had been taken. It is true that the plant did not function satisfactorily when the first attempt was made to put it into operation; but, as shown by the testimony, such difficulty is not unusual in getting a new chemical plant into operation, particularly where *105 the production process involves a novel feature, such as was the use of the large kiln in Gulf's plant. The important facts are that, as shown by our Findings of Fact, Gulf's management did not consider the difficulties to be insurmountable, and took no steps to discontinue the business or to liquidate the corporation. Rather, they proceeded to rectify the mechanical and technical difficulties which had been encountered; arranged for an engineer, who was employed by the Tennessee Valley Authority, to come to the plant annd assist in the solution of Gulf's problems; erected a pilot plant with which to make experiments on the manufacture of a new product; and also made a survey as to the marketability of such product. This activity was in progress at the end of the year 1949; and the experiments then being made continued into the early months of 1950. Also, the record is devoid of any evidence of any identifiable event in 1949 which would serve to wipe out the potential value of the stock. There was no petition in bankruptcy; no cancellation of the charter; no fire or other disaster; and apparently no pressure from any important creditor. The parties have stipulated that the stock *106 did have value as of January 1, 1949; and the above-mentioned facts negative any conclusion that such value may have been wholly eliminated during the course of said year. What we have said above with respect to the common stock of Gulf Chemical Company, applies also to the 4 per cent subordinated notes of that corporation. These notes were all held by the stockholders, and they represented merely another method of providing Gulf with the capital which was needed for the erection and operation of its plant. The value of the notes depended, from the time of their original issuance, not only upon the assets of the corporation, but also upon the potentiality of the corporation to earn profits in the future. As we have heretofore pointed out, no identifiable event occurred in the year 1949 which wiped out the potentiality for such profits. Finally, it should be observed that, although our foregoing conclusions have been based on evidence respecting events which occurred prior to the end of the year 1949, the soundness of such conclusions is supported by the events of subsequent years. As shown in our Findings of Fact, petitioner Schoenfeld reported to the corporation in March 1950 *107 that the experiments which he had begun in November or December 1949, on the production of a new product, had been successful; and he further reported that his market survey revealed that there was a demand for such product. Thereupon in April 1950, the larger stockholders and security holders of the corporation decided to go forward with the manufacture of such new product; new financing was arranged; [2] the maturity dates for installment payments on the bank loan were extended; arrangements were made with International Mineral & Chemical Corporation to use one of its patented processes; and full scale operation of the plant actually commenced in 1950, and continued until sometime in 1953. The demand for the corporation's product far exceeded its capacity to produce such product, with the amount of raw materials available to it under the existing governmental restrictions. *108 On the basis of all the evidence, we have heretofore found as a fact and we here hold, that neither the common stock of Gulf Chemical Company nor the 4 per cent subordinated notes of that company became worthless during and within the year 1949. Accordingly, we approve the action of respondent in denying to the petitioners the claimed deductions here involved. Decisions will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * *
(g) Capital Losses. - * * *
(2) Securities Becoming Worthless. - If any securities * * * become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets. * * *
(k) Bad Debts. - * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.↩
2. In connection with the refinancing plan adopted and put into effect in 1950, the corporation's 4 per cent subordinated notes (which are the same promissory notes which petitioners here contend became worthless in 1949) were exchanged by the holders (including petitioners) for newly issued shares of preferred stock of the corporation.↩